IN THE COURT OF CRIMINAL APPEAL S OF TENNESSEE
AT KNOXVILLE
March 26, 2024 Session

## STATE OF TENNESSEE v. JONATHAN DARRELL HARDIN, ALIAS

**Appeal from the Criminal Court for Knox County**
**No. 114883   Steven W. Sword, Judge**

_____

### No. E2022-01753-CCA-R3-CD
_____


The Knox County Grand Jury charged Defendant, Jonathan Darrell Hardin,[1] with one count of especially aggravated kidnapping and one count of aggravated assault. Following a jury trial, Defendant was found guilty of the lesser offenses of aggravated kidnapping and assault. The trial court imposed an effective sentence of ten years in the Tennessee Department of Correction (TDOC), to be served consecutively to a ten-year sentence for a prior conviction. On appeal, Defendant argues: (1) the State committed discovery violations by not disclosing certain evidence; (2) Defendant's fair trial rights were violated by the State's failure to preserve and withhold material evidence; (3) the State improperly commented on Defendant's right to silence; (4) the State improperly commented on Defendant's post-arrest silence during Defendant's cross-examination; (5) Defendant's trial counsel rendered ineffective assistance by not calling an eyewitness witness to testify; and (6) Defendant is entitled to relief based on cumulative error. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Randall E. Reagan (at motion for new trial and on appeal) and Andrew Pate (at trial and sentencing), Knoxville, Tennessee, for the appellant, Jonathan Darrell Hardin.

---

[1] Charging instruments returned by the Knox County Grand Jury routinely list the defendant's name followed by "Alias." The record contains no order from the trial court striking "Alias," so we will keep that reference in the style of the case. However, all other references to Defendant in this opinion will not include "Alias."

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Hector Sanchez and Sean Roberts, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Background

Defendant was convicted of one count of aggravated kidnapping and one count of assault for an incident involving his then-girlfriend, Megan Fugate (the "victim"). The assault began at the Knoxville apartment of Darrell Bryant, where Defendant and the victim lived at the time, but Defendant then forced the victim into his car. Officers with the Knoxville Police Department (KPD) found Defendant and the victim inside Defendant's car at an East Knoxville gas station. They found Defendant asleep behind the steering wheel and the injured victim in the rear passenger seat.

### A. Trial

At trial, the victim testified that she and Defendant had been "having many problems before" these offenses, which occurred in the early morning hours of December 16, 2018. The evening of December 15, 2018, the victim and Defendant got into an argument because Defendant wanted her to go out with him, but the victim wanted to stay at Mr. Bryant's apartment with her five-year-old son. While Defendant went out without the victim, Mr. Bryant remained at the apartment, which was located on the upstairs floor of a house on Magnolia Avenue in East Knoxville next to a Pilot gas station. The apartment had one bedroom where the victim and Defendant stayed, while Mr. Bryant stayed in the living room.

While Defendant was out, the victim texted him, telling him they "were done." The victim asked Defendant to stay away from her and her son and to let Mr. Bryant know when Defendant would be returning to collect his things so she and her son would not be present at that time. After this text, the victim and Defendant engaged in three video chats and continued to argue. This prompted the victim to "cut off" Defendant's cellular phone, for which she had been paying. The victim's son was already asleep, and she soon fell asleep herself.

The victim testified that she awoke in the bedroom to find Defendant punching her in the face and saying, "B****, you think you're funny. Did you think that was funny cutting my phone off?" The victim responded she was sorry and promised to restore his cellular phone service. According to the victim, Defendant responded by pushing her

- 2 -

against the wall and asking for her cellular phone. When Defendant could not find her phone, he continued to punch her.

The victim testified that sometime during the attack, Defendant pulled out a box cutter and threatened to kill her and her son. Defendant told the victim's son to wake up and "look what I'm doing to your momma." Shortly thereafter, Mr. Bryant entered the room and attempted to get the victim and her son out of the house. The victim did not want to take her son outside, but she placed her son in the living room and "pushed him in[to] a corner" and "put a blanket over him." The victim said Mr. Bryant then attempted to "push [Defendant] back" while she attempted to give Defendant his cellular phone, but Defendant kept punching the victim in the face "repeatedly." Mr. Bryant then told her to run for the door; she did so, but Defendant grabbed the victim by the hair, "yank[ed]" her backward, shoved her into the wall, and slammed the door, saying she "wasn't going anywhere." Defendant kept shoving her into the wall while asking for her cellular phone, ignoring both the victim's and Mr. Bryant's pleas to stop.

After a while, Mr. Bryant left the apartment to go to his car and the victim gave Defendant her cellular phone. The victim asked Defendant to leave her alone, but Defendant told her, "You're coming with me" and, pulling the victim by her hair, forced her outside the door. Defendant "dragged" the victim down the stairs toward his car; the victim said Mr. Bryant passed them on the stairs but said and did nothing. Once the victim and Defendant reached street level, she tried to escape but Defendant slammed her into a wall, told her she was "coming with" him, pulled out the box cutter again, and hit her twice in the side and once in the neck. The victim said the box cutter either lacked a blade or "didn't lock because nothing cut me." Defendant then continued dragging the victim toward his car. As Defendant did so, a bystander told Defendant, "You need to stop. Let her go." Defendant responded by threatening to kill the bystander just like he was "about to kill" the victim.

According to the victim, when she and Defendant reached his car, Defendant hit her twice in the face and once in the stomach before pushing her into the car and driving away. A female passenger was in the car, but the victim did not know the other passenger.[2] Defendant eventually stopped to let the other passenger out. When the passenger opened her door, the victim tried to escape but Defendant grabbed the victim by her hair. The passenger slammed the door shut and left, and Defendant sped away with the victim still in the car.

---

[2] At the hearing on Defendant's motion for new trial, the passenger was identified as Toya Reeves. However, Ms. Reeves' identity was not disclosed at trial, including in Defendant's trial testimony as discussed later in this opinion.

After a while, Defendant and the victim parked in the driveway of Defendant's mother's house. The victim asked to be taken to a hospital, but Defendant told her that she would first have to reconnect his cellular phone service. After she did so, Defendant drove to a Weigel's gas station on Cherry Street in East Knoxville. While the victim and Defendant were at the gas station, she texted Mr. Bryant to ask about her son (who was still at Mr. Bryant's apartment) and let him know where she and Defendant were. The victim did not want Mr. Bryant to bring her son to the gas station, so Mr. Bryant agreed to take the child to Defendant's mother's residence.

At 3:39 a.m. on December 16, 2018, Knox County 911 received a call in which the caller claimed to have heard a man and a woman screaming at each other. An audio recording of this call was played during trial. The caller claimed the house was located next to a Pilot gas station on Magnolia Avenue; the location of the house corresponded to the location of Mr. Bryant's residence. The caller explained that at one point, a woman ran behind a "white Caravan" and a man followed the woman, after which the caller heard a "slamming" noise. After hearing this noise, the caller heard no other screaming. The caller told the 911 operator that he did not see anyone carrying a weapon.

KPD Lieutenant Stanley Cash was one of the officers who responded to the dispatch following the 911 call. As the lieutenant approached the Magnolia Avenue address identified in the call, he saw a white Dodge Caravan leaving the scene. He conducted a traffic stop on the van three minutes after the 911 call was placed. Mr. Bryant was driving the van and the victim's son was in the front seat. The lieutenant spoke with both van occupants and learned that Defendant and the victim were at the Weigel's gas station referenced above.

Lieutenant Cash then proceeded to Weigel's; KPD Officer Rodney Townsend and Sgt. Chris Bell also responded to Weigel's where Defendant's car was parked. The lieutenant testified that he arrived at the gas station after the other two officers; dash camera video from Officer Townsend's vehicle reflects that Officer Townsend and Sgt. Bell both arrived at Weigel's at 4:31 a.m.[3] Officer Townsend and Sgt. Bell found Defendant in the front driver's seat, either asleep or passed out. After the officers removed Defendant from his car, they found the victim in the back seat of the car with visible bleeding from her nose. Officer Townsend testified that he conducted an inventory search of Defendant's vehicle and found "a large utility knife" or what he considered "a carpet knife with a razor blade end that was laying in the front floorboard . . . beside the driver's left foot." Lieutenant Cash testified that he saw the box cutter but it was in Officer Townsend's hand when he saw it. Officer Townsend testified that he left the six-inch-long box cutter inside

---

[3] Officer Townsend testified the delay resulted from the officers initially responding to a different East Knoxville Weigel's before responding to the Cherry Street location.

Defendant's car when it was towed away because, at the time of the inventory search, he had no information "that showed that [the] box cutter was directly involved" in any potential offense. The officer, who was not involved with this case after Defendant's car was towed, did not know what happened to the box cutter, nor did he know what happened to a car towed to the impound lot following a suspect's arrest. The impound lot was operated by the City of Knoxville, not KPD.

A video recording from the interaction from Officer Townsend's dash camera was made an exhibit at trial. It shows a large portion of the police officers' contact with Defendant and Officer Townsend's search of the car. The video reflects that Officer Townsend did not begin searching Defendant's car until after an ambulance took the victim from Weigel's; the search began approximately ten minutes after Lt. Cash and Sgt. Bell were last seen on Officer Townsend's dash camera video. As Defendant notes in his brief, the video does not show the officer speaking with Lt. Cash about any items found in Defendant's car.

Sergeant Bell did not mention a box cutter during his testimony, although during his testimony an audio recording of a portion of his discussion with the victim was played for the jury. In the recording, Sgt. Bell asked the victim if Defendant had a weapon. The victim initially responded, "He's got a box cutter, I saw it on . . . ." The victim's voice faded at the end of this comment, which she immediately followed by stating, "I don't know if he's got it on him, I don't know."

Mr. Bryant testified that in the early morning hours of September 16, 2018, he was at his apartment watching basketball when he became aware of the door to his apartment opening. Mr. Bryant assumed this was Defendant returning from his night out. Mr. Bryant then heard the victim scream from her room; this caused Mr. Bryant to go to the victim's room, where he found Defendant screaming at the victim about Defendant's phone. Mr. Bryant testified that after the argument continued for a while, he told Defendant and the victim to leave. According to Mr. Bryant, he saw Defendant standing over the victim, who was on the floor, pulling her hair. Mr. Bryant separated the two, but Defendant was able to push past Mr. Bryant and follow the victim toward the back of the apartment, where Defendant "pushed [the victim] real hard." Mr. Bryant again told Defendant and the victim that they had to leave, and they did. Mr. Bryant then took the victim's son with him and left the apartment, intending to drive the victim's son to Defendant's mother's house. However, shortly after Mr. Bryant and the victim's son left the apartment, Lt. Cash pulled over Mr. Bryant's van.

Mr. Bryant testified that during the altercation between Defendant and the victim, Defendant "said he was going to get his cutter and kill" the victim and Mr. Bryant. Mr. Bryant testified that he did not feel afraid over the Defendant's statement, and Mr. Bryant

was not asked about whether he saw Defendant with a weapon.  Mr. Bryant denied he and the victim were in a romantic relationship, and he said that Defendant had never accused him of being romantically involved with the victim.

Defendant testified on his own behalf and claimed that the victim did not attempt to break up with him by text.  Instead, he said his argument with the victim started when he returned to the apartment to find the victim performing oral sex on Mr. Bryant.  Defendant claimed that the victim's son was in the same room asleep.  This led Defendant to grab the victim by her hair and "assault[]" her inside the residence.  Defendant testified that he and the victim both left Mr. Bryant's apartment when Mr. Bryant told them to leave.  Defendant acknowledged that when climbing down the stairs outside the apartment, he and the victim continued their argument, and he hit her again.  However, Defendant denied hitting the victim to force her into the car and claimed she got into the backseat willingly because the victim had "nowhere to go."  Defendant acknowledged there was "this other female" passenger inside his car whom he was giving "a ride home."  On his way to the other passenger's home, Defendant admitted the passenger saw blood on the victim's face and told Defendant, "I don't want nothing to do with this."  Defendant said when this passenger left, the victim stayed in the backseat.  They continued arguing, with Defendant stating "it was a very emotional moment."  Defendant then drove to the Cherry Street Weigel's to get cigarettes, where he fell asleep inside the car.  He awoke when KPD officers removed him from the car.

Defendant denied having a box cutter in the car when he was arrested, and he denied displaying a box cutter or hitting the victim with one at any point during the incident.  He claimed both the victim and Officer Townsend lied on the stand about the box cutter.  Defendant also denied that he prevented the victim from leaving his car, but said that the victim did not attempt to leave and did not tell him that she wanted to leave.

As stated above, Defendant was charged with especially aggravated kidnapping and aggravated assault.  In its instructions to the jury, the trial court stated that relative to the aggravated assault charge, "the [S]tate has elected to submit for your consideration the alleged act of when the [D]efendant displayed a box cutter in [the victim's] bedroom and she was injured."  After its deliberations, the jury found Defendant guilty of the lesser-included offenses of aggravated kidnapping and assault.

At a subsequent sentencing hearing, the trial court imposed a sentence of ten years' imprisonment for aggravated kidnapping and eleven months, twenty-nine days for assault, to be served concurrently.  The trial court ordered this effective ten-year sentence to be

served consecutively to a ten-year sentence Defendant was serving for an unrelated prior conviction.[4]

## B. Motion for New Trial

### 1. Box Cutter and Tow Ticket

At the hearing on Defendant's motion for new trial, Paul Hatch, an investigator for Defendant's current attorney,[5] testified that he contacted the City of Knoxville impound yard, and the person who spoke with him said "it's discretionary whether or not they do an inventory report when you impound a car." Mr. Hatch then went to KPD's records division and was told that there was no record of an inventory report for Defendant's car referenced in KPD's computer database. Mr. Hatch requested that KPD check the physical file cabinets, and records regarding Defendant's vehicle were found. One such record was a one-page "Tow Ticket" which provided basic information for the car (make, model, VIN, registered owner, etc.). The ticket also contained the notation "Prop. In Vehicle: Clothing."

Defendant's trial counsel ("Counsel") did not represent Defendant until after his presentment was returned and the case was transferred to Criminal Court. Counsel testified he filed pretrial requests for discovery, to produce exculpatory evidence, and to inspect and copy all documents and tangible evidence. He also filed a motion to preserve evidence. However, by the time Counsel filed these motions, Defendant's car had already been sold at auction.

Counsel recalled that in the affidavit of complaint, the victim had mentioned Defendant's using a box cutter. However, the affidavit did not state that the police had found a box cutter in Defendant's car. The first time trial counsel heard about KPD's purportedly finding a box cutter was at trial. Counsel testified, "I had been told multiple times by the District Attorney that there—that no box cutter had been found." Counsel added, "the absence of this box cutter seemed very material to me and [I] was told that it had never been found." Counsel also recalled receiving the in-car dash camera videos of the responding officers about a week before trial; in light of the State's prior representations, Counsel did not review the videos before trial to see if a box cutter was referenced. However, after testimony concerning the box cutter was introduced at trial, Counsel reviewed the videos, and he did not see Lt. Cash and Officer Townsend converse regarding a box cutter.

---

[4] Defendant does not challenge the length or manner of service of his sentences on appeal.

[5] Defendant's family retained his current attorney before the hearing on Defendant's motion for new trial.

Counsel testified that he and his investigator, Barry Rice, investigated whether there was a box cutter because the defense strategy "was heavily based around the lack of material evidence in this case and the nonexistence of that box cutter [was] very important to our trial strategy." Counsel was aware that Mr. Rice "did some follow[-]up with the police to determine that there was not an inventory report that indicated that . . . they had found a box cutter." In Counsel's view, "it should have been very relevant in the officers' mind. If they, in fact, found a box cutter, that would have been evidence they would have wanted to preserve." Counsel further observed that "the officer also testified that he didn't check whether there was a blade in it. And I think that would be very relevant information that an officer would check," as there was "a huge difference in a box cutter with a blade and an empty box cutter."

Counsel testified that he had not seen the tow ticket located by Mr. Hatch before the new trial hearing. In reviewing the ticket, counsel stated, "it states that the only property found in the vehicle was clothing, so it contradicts the testimony that a box cutter was found. So it would have been very relevant to the *Ferguson* motion that I made during trial."[6] Counsel said he would have also considered filing a *Brady* motion had he known about the tow ticket before trial.

Counsel testified that before trial, he listened to the recording of the police interaction with Mr. Bryant after his van was pulled over. When asked whether Mr. Bryant mentioned a box cutter during that conversation, Counsel said, "It's been a really long time since I watched that video. . . . I don't remember with specificity on that, but he said so much. It was—as you said, it was a lot of babbling . . . on that tape." However, Counsel acknowledged that if he had heard Mr. Bryant reference a box cutter, Counsel would have remembered that for trial.

Counsel also recalled that in the victim's preliminary hearing testimony, she testified that Defendant first produced the box cutter and hit her with it when they reached Defendant's car, which was after they had left Mr. Bryant's apartment. Counsel did not cross-examine the victim on this inconsistency at trial because "I considered that particular inconsistency to not be that material." He added, "hammering her on the minutia[e] and getting her to say the word box cutter about [thirty] more times to the jury would, frankly, do more harm than good." Counsel was also concerned that there was a chance the victim would have attempted to clarify her preliminary hearing testimony to state "yeah, he had it in the bedroom, too."

---

[6] As discussed later in this opinion, Counsel made a timely motion to dismiss the indictment pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), arguing that the State failed to preserve the box cutter.

Similarly, Counsel did not cross-examine the police officers considering the in-car dash camera video that did not appear to show the officers identifying or discussing a box cutter. Counsel stated that in one of the videos, "there were some parts . . . where [Officer Townsend]'s looking in the vehicle, and you can't see exactly what he has, but it's at least conceivable that it could be a box cutter." Counsel decided that he did not want to recall Lt. Cash to question him about the video because doing so would have given the officer an opportunity to discuss the box cutter in greater detail.

Mr. Rice, Counsel's investigator, testified he attempted to find Defendant's car after Counsel was appointed, but upon visiting the impound lot he learned Defendant's car had been sold. Mr. Rice was also told there was no intake sheet for the car. The new trial hearing was the first time Mr. Rice had seen the tow ticket and City of Knoxville Impound Report obtained by Defendant's current attorney.

## 2. Toya Reeves

At the hearing on Defendant's motion for new trial, Counsel was questioned about why he did not call Toya Reeves—the female passenger in Defendant's car when Defendant forced the victim into the car the night of the incident—as a witness. At trial, following Defendant's testimony, the trial court asked Counsel if Defendant was the defense's "first and only witness." Counsel, referencing Ms. Reeves, replied, "We've got another witness that we—a rebuttal witness that we were thinking about using, but she has refused to come."

Ms. Reeves did not testify at the hearing; rather, her June 21, 2022 affidavit was introduced as an exhibit. In the affidavit, Ms. Reeves stated that on the morning of the incident, Defendant was driving her to her mother's house in his vehicle when he stopped at Mr. Bryant's apartment. She remained in the car while Defendant went inside. After about thirty minutes, Defendant emerged with the victim, who had blood on her nose. Ms. Reeves stated that although Defendant had his hand on the victim's shoulder when the victim entered the car, Defendant "did not push her in the car" and did not grab the victim's hand or arm. Ms. Reeves also claimed the victim "was quiet" and "wasn't panicky" when entering the car, and neither the victim nor Defendant screamed at each other. Ms. Reeves also asserted that Defendant "did not threaten her with a box cutter or threaten[] her at all." Ms. Reeves stated that Defendant drove to her mother's house, and she exited the car. Ms. Reeves said that during the drive, neither the victim nor Defendant said anything about what had occurred at Mr. Bryant's apartment.

At the hearing on the motion for new trial, Counsel testified that he and his investigator, Mr. Rice, either individually or collectively interviewed Ms. Reeves several times before trial, and following the first interview Counsel believed Ms. Reeves was "a

state witness" who would implicate Defendant in the offenses with which he was charged. Later, after Ms. Reeves "talked to some people who were friendly with" Defendant, she told Counsel a version of events more beneficial to Defendant but "completely inconsistent with her first" statement. However, Counsel believed her first statement was more credible.

Counsel testified that the defense team, including Defendant, discussed calling Ms. Reeves, but Counsel concluded that "she was somebody who didn't want to make waves, didn't want this to . . . get her in trouble . . . she, basically, didn't really want to be involved very much." Counsel explained that the State did not know Ms. Reeves's identity before trial, and he did not subpoena Ms. Reeves as a witness because "if we subpoenaed her, that would [have] require[d] us to disclose her information to" the State. Counsel said the defense team was "very worried, that if a police officer and a victim witness coordinator met with her, that she would be inclined to reinstate the . . . first version of events that she told us and that she would become a State's witness." Nevertheless, Counsel testified, Mr. Rice contacted Ms. Reeves after the first day of trial and found Ms. Reeves "was not cooperative. She didn't want to come and she also didn't want to tell us, really, anything. Her current version of events was that—basically, trying to make herself sound as useless as possible." Counsel ultimately reached "a considered specific strategic decision based on numerous meetings with Mr. Rice and [Defendant], that subpoenaing her . . . would be damaging to our case."

Counsel acknowledged that in the defense team's numerous discussions with Ms. Reeves, she never stated Defendant had a box cutter. At one point, Counsel stated, "as to the specific issue of not having seen a box cutter present . . . at least once, she did say that." However, at another point during his testimony Counsel testified that he did not "recall her stating affirmatively there definitely was no box cutter." Because Counsel was unaware that the State would present proof that an officer found a box cutter in Defendant's car, Counsel "didn't think it was significantly valuable to have one extra witness to say they didn't see a box cutter."

Mr. Rice's testimony was consistent with that of Counsel. Mr. Rice testified that in his first interview with Ms. Reeves, she told him that when the victim emerged from Mr. Bryant's apartment, she "had a bloody nose, which was bad for us. [Defendant] had ahold of the victim's arm. When they got down to the car, she saw the victim try to pull way and run. [Defendant] grabbed her again and told her to get into the car." According to Ms. Reeves, Defendant "kept ahold of [the victim] until he put her in the car." Mr. Rice testified that Ms. Reeves changed her story after speaking with Defendant's brother, which led her to remember events "differently." He also acknowledged that Ms. Reeves told him that "she did not see any weapon or box cutter." Before trial, he and Counsel "decided that we were probably not going to use this witness."

During a break at trial, after testimony concerning the box cutter was introduced, Mr. Rice and Counsel discussed whether to call Ms. Reeves to testify:

> Even if she said everything badly . . . she was consistent in that there was no box cutter. And a big portion of our defense was that there was no box cutter in evidence, no one else had seen a box cutter and so there wasn't a weapon involved in this case.

Nevertheless, the defense team decided not to call Ms. Reeves.

Defendant's testimony at the hearing was brief. Defendant testified that he discussed subpoenaing Ms. Reeves "a little bit" with his attorney. Defendant "requested for him to subpoena her, but . . . [Counsel] didn't think it was a good idea."

After the hearing, the trial court entered a written order denying the motion for new trial. This appeal followed.

## II. Analysis

On appeal, Defendant takes issue with what he views as the State's withholding or otherwise failing to disclose the existence of two items of evidence: a box cutter, which Officer Townsend testified he found on the floorboard under the steering wheel of Defendant's car; and a tow ticket, located by his appellate attorney's investigator before the hearing on Defendant's motion for new trial. The tow ticket only identified "Clothing" as the property in Defendant's car when it was impounded.

### A. The Tow Ticket

Defendant argues the tow ticket "contained material information favorable to the defense" in that it "could have been used to impeach [Officer] Townsend's testimony that there was a box cutter in [Defendant]'s car." He asserts that the State's "failure . . . to provide the tow ticket to the defense for use at trial violated [Defendant]'s rights to due process under both the Tennessee and the United States Constitution and requires that his conviction be vacated and this case remanded for retrial."

In *Brady v. Maryland*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The Tennessee Supreme Court has held that to establish a *Brady* violation, a defendant must show that (1) he requested the

information (unless the evidence is obviously exculpatory, in which case the State is obligated to release the information regardless of whether it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material. *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995).

At trial, the defendant bears the burden of proving a *Brady* violation by a preponderance of the evidence. *Id.* Appellate courts "review the lower court's 'findings of fact, such as whether the defendant requested the information or whether the state withheld the information . . . *de novo* with a presumption that the findings are correct unless the evidence preponderates otherwise.'" *State v. Thomas*, ___ S.W.3d ___, No. W2019-01202-SC-R11-CD, 2024 WL 979852, at *20 (Tenn. Mar. 7, 2024) (quoting *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004)). "[C]onclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely *de novo* standard with no presumption of correctness." *Id.* (quoting *Cauthern*, 145 S.W.3d at 599).

Evidence "favorable to the accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). Put another way, favorable evidence "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of events, or challenges the credibility of a key prosecution witness." *Id.* at 56-57 (quotation omitted).

One of the core requirements of *Brady* is that the supposedly withheld information must have been material. *See United States v. Bagley*, 473 U.S. 667, 682 (1985); *Edgin*, 902 S.W.2d at 389. The Supreme Court has expounded the definition of "material" evidence as follows:

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light

- 12 -

as to undermine confidence in the verdict." *Id.* at 435; *see also Johnson*, 38 S.W.3d at 58 (reaching similar conclusion).

Here, the record reflects that Defendant filed pretrial motions for discovery pursuant to Rule 16 of the Tennessee Rules of Criminal Procedure and for exculpatory information. We agree with Defendant that the tow ticket, which does not include a box cutter among the items found in the car, could have been used to impeach Officer Townsend's testimony that he found a box cutter. And while the information was in the State's possession, the State did not provide the tow ticket to the defense, even if the State did not actively withhold the ticket from the defense. However, we agree with the State's assertion that the tow ticket was not material.

The primary purposes of an inventory search are to "protect the owner's property while it remains in police custody, and also, to protect the police against claims of lost or stolen property." *State v. Glenn*, 649 S.W.2d 584, 588 (Tenn. 1983). It logically follows that any and all property would be individually listed on an inventory, and the KPD's procedures state that a "thorough inventory" should be conducted and list "a description of all items found as well as any items noticeably missing (i.e. battery, radio, spare tire)." The Department's procedures also require a second officer to conduct a separate inventory after the first, and for "[b]oth members . . . to be identified on [the] Vehicle Impoundment Form indicating the inventory is complete."

Here, the word inventory is noticeably absent from the tow ticket, and the ticket contains no individual list of items found or missing in the car. Rather, under "Prop. In Vehicle," the ticket lists "Clothing." If clothing did constitute the only items found inside the car, any inventory of the car's contents should have contained a detailed, item-by-item list of each article of clothing found. No such itemized list is on the ticket. Further, only Officer Townsend's name is listed on the ticket, and a second officer is not identified per the Department's procedures. We agree with the State that the tow ticket does not appear to be an inventory of the car's contents. As such, the absence of a box cutter from the form is of limited value to the defense. Further, we note that had the tow ticket been introduced at trial, the jury would have been presented largely with the same information it had already considered—there was no box cutter introduced as an exhibit despite the officers' testimony that one was found in Defendant's car.

We also observe that Defendant was acquitted of aggravated assault and especially aggravated kidnapping, both of which would have required use of the box cutter (or, in the case of especially aggravated kidnapping, "use or display"). Thus, any prejudice resulting from the missing tow ticket was resolved by the jury's verdicts. Defendant's conviction of aggravated kidnapping only required the threatened use of the box cutter. Both the victim and Mr. Bryant testified that Defendant threatened to use the box cutter before Defendant

and the victim reached the car. Timing is also important, because the victim testified that Defendant hit her with the box cutter before she reached the car. Consequently, even if the tow ticket suggested that no box cutter was found in the vehicle, the jury still could have convicted Defendant based on his threats to use the box cutter while at the apartment and striking the victim before they got into the car.

Because the tow ticket did not constitute material evidence, the State did not commit a *Brady* violation by failing to disclose the ticket to Defendant before trial. Defendant's fair trial and due process rights were not violated based on the missing ticket, and Defendant therefore is not entitled to relief on this issue.

## B. The Box Cutter

Defendant contends that the State's failure to preserve the box cutter, and the State's failure to inform the defense that a box cutter had been found when it intended to introduce testimony to that effect, violated Defendant's rights to due process and a fair trial. Accordingly, Defendant contends, the trial court erred when it refused to dismiss the indictment based upon the missing evidence. We disagree.

In *State v. Ferguson*, the Tennessee Supreme Court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (Tenn. 1999)). Our supreme court further observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "strict bad faith analysis" espoused by the United States Supreme Court, in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *Id.* at 784-85. "[F]undamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* (citing *Ferguson*, 2 S.W.3d at 914, 917).

Under this "balancing approach," the trial court must first "determine whether the State had a duty to preserve the evidence." *Id.* at 785. The State's duty to preserve is "limited to constitutionally material evidence." *Id.* To be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.(*Ferguson*, 2 S.W.3d at 915, 918). If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Id.* (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State

lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure:

> (1) the degree of negligence involved;
> (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
> (3) the sufficiency of the other evidence used at trial to support the conviction.

*Id.* (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id.* at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *See id.* at 791 ("Because the application of *Ferguson* . . . presents a constitutional issue, we will apply a de novo standard of review to the trial court's decision concerning the fundamental fairness of the trial."). The trial court's choice of remedy, however, will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 792 ("Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal.").

The record reflects that at the close of the State's proof, Defendant moved to dismiss the indictment based on the State's failure to preserve the box cutter. Counsel emphasized that the trial was "the first time . . . that [he had] ever heard that a police officer found or handled a box cutter in this case." Counsel continued, "[The victim] said in her testimony that she wasn't even sure if it had a blade. What if I got ahold of that box cutter, and there was no blade in it? That's powerful exculpatory evidence, Your Honor. That's *Brady* evidence." Counsel labeled the missing box cutter "the textbook case of a case that is subject to absolute dismissal under . . . *Ferguson*." The trial court denied Defendant's motion to dismiss the indictment:

> So that is pure speculation that there wasn't a blade in there. If Townsend or Cash had said, [w]e picked up this box cutter, and we looked at it, and there was no blade in it, then, yes, that would be exculpatory. But it's just speculation to think that that was the case.
>
> And so I don't think there's been a *Brady* violation because there's— whatever Townsend found in there, it's not, obviously, exculpatory. And so

- 15 -

that's when you get into *Ferguson*. *Ferguson*'s when it's exculpatory or potentially exculpatory proof.

What should have happened in this case is when the State found out that Townsend had seen it in there, they should have told the defense. And I don't think, under Rule 16, they're required to do it, because it's not something they are planning on using in their proof because they don't have it anymore for them to see. And it's not a Brady violation, as I said, or Rule 16, because it's not, obviously, exculpatory. But it would have been best for them to let them know so they don't get sort of blindsided by this.

Since it's not exculpatory, I don't think there's any great degree of negligence involved in the case. You know, an officer is searching the car. At the point he's searching it, doesn't have any idea that this box cutter was involved in it, so he just puts it back in there. That's not negligence. I mean, that's what he should be doing. He's—unless it's evidence they're planning on seizing, you don't take it.

The significance of destroyed evidence is very slight because there's nothing that would help [Defendant]. Had they maintained it, then it would certainly help the State. And so there's not anything from that box cutter, had it been preserved, that would help the defendant. It's pure speculation that it would have helped him.

And then the sufficiency of the other evidence used at trial to support the conviction, that is—I know it's her testimony that she saw it, but there is somebody else that has allegedly seen this box cutter. The officer is not the only person to see it. And so the incident happened on video, like in a DUI, which is what *Ferguson* came out of, so we don't have that. So, you know, it does not rise to the level of a *Ferguson* violation, certainly, for the grounds of dismissal.

But because I think the State should have told the defense about it beforehand, I will give the *Ferguson* instruction, which is [T.P.I. Crim. 42.23]. The State has a duty to preserve evidence which possesses exculpatory value. And then I'll let you-all argue whether or not it did possess it or not.

So I'll do the—I'll grant the defense's request to give the instruction, but it doesn't rise to the level of a due process violation. And I think I'm being generous by instructing it, because as I said, I don't think there's due—

I don't think it's exculpatory, but I do think the State should have told the defense as soon as Officer Townsend tells them, Hey, I saw it, and it was put back in the car. As soon as that happened, you-all should have told them. But it's not *Brady*, so I'm not going to dismiss it.

We concur with the trial court's well-reasoned analysis in determining that a missing evidence instruction, rather than dismissal of the indictment, was the appropriate remedy. Like the trial court, we agree that the degree of negligence involved in disposing of the box cutter was minor. Officer Townsend thought that the box cutter had no connection to the case, so he left the box cutter in the car rather than collect it. Ultimately, the box cutter was kept from Defendant based on minor negligence rather than gross negligence or intentional misconduct.

Furthermore, the probative value of the box cutter was slight. If the box cutter had been preserved, it would have strengthened the State's case unless the tool was missing a blade. In that case, the evidentiary value of a box cutter missing a blade would have been about the same as an absent box cutter, which is what the jury encountered at trial. Additionally, the jury could have reasonably concluded the blade fell out of the box cutter before being left in the car, or the bladeless box cutter could have supported the theory that Defendant merely threatened its use, which still would have supported a conviction for aggravated kidnapping.

Finally, as stated above, the jury acquitted Defendant of aggravated assault, concluding the State did not prove beyond a reasonable doubt that Defendant used a box cutter to inflict the victim's injuries. The jury also acquitted Defendant of especially aggravated kidnapping, concluding that the State did not prove beyond a reasonable doubt that Defendant accomplished the victim's removal or confinement by use or display of the box cutter. Thus, the missing box cutter did not prejudice Defendant in that regard. And because Defendant does not challenge the sufficiency of the evidence for the offenses for which he was convicted, we conclude the third *Merriman* factor regarding the sufficiency of evidence did not weigh in favor of dismissing the indictment.

Accordingly, we conclude the trial court did not err in granting a *Ferguson*-based missing evidence instruction rather than dismissing the case. Defendant is not entitled to relief on this issue.

### C. State's Questioning Defendant Whether Witnesses were "Lying"

Defendant contends the State "committed prosecutorial misconduct" during Defendant's cross-examination by asking him "whether KPD Officer Townsend lied when Townsend testified that he found a box cutter in [Defendant's] car." Defendant contends

the State's question required Defendant to comment on witness credibility, which invaded the province of the jury. Defendant contends the error was compounded when the trial court "chastised" Defendant during the question, and by the State's supposed "withholding of the exculpatory tow ticket." Both parties recognize Defendant did not object to the questioning at trial, and therefore the issue is waived on appeal and Defendant is limited to plain error review.

A defendant's failure to object waives the issue on appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

When an issue is waived on appeal, this court may only review the issue for plain error. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). This court will grant relief under plain error only if an appellant can establish all of the following:

> (a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is necessary to do substantial justice.

*Id.* (internal quotation omitted; citing *State v. Adkisson,* 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "Because each factor must be established, [an appellate court] need not consider all five factors when a single factor indicates that relief is not warranted." *State v. Fayne,* 451 S.W.3d 362, 372 (Tenn. 2014) (citing *State v. Bledsoe,* 226 S.W.3d 349, 355 (Tenn. 2007)). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page,* 184 S.W.3d 223, 231 (Tenn. 2006).

Here, the record reflects that during the State's cross-examination of Defendant, after Defendant testified that the victim smeared blood on her nose and lied when she testified that he used a box cutter to hit her and force her into Defendant's car, the following exchange occurred:

> [Prosecutor]: Okay. So Officer Townsend is—your testimony is Officer Townsend is lying?

[Defendant]: I didn't say that. I said—I've said exactly what he said. That's not for me to judge. I can't judge him.

The Court: Hold on a second, General.

You get to explain your answer, but you have to answer the question first. So listen to what the question is, answer the question, and then if you need to offer an explanation, you can offer an explanation. You're just going straight into trying to explain things—

[Defendant]: Yes. I believe he did.

Although the record clearly establishes what occurred in the trial court, Defendant cannot establish that this exchange violated a clear and unequivocal rule of law. Defendant cites to federal case law concluding it is "error for a prosecutor to induce a witness to testify that another witness, and in particular a government agent, has lied on the stand." *United States v. Boyd*, 54 F.3d 868, 871 (D.C. Cir. 1995); *see also United States v. Freitag*, 230 F.3d 1019, 1024 (7th Cir. 2000) ("Because credibility questions are for the jury, it is improper to ask one witness to comment on the veracity of the testimony of another witness."); *United States v. Sullivan*, 85 F.3d 743, 750 (1st Cir. 1996) ("[W]e state the rule now emphatically: counsel should not ask one witness to comment on the veracity of the testimony of another witness."). However, this court, in addressing the Seventh Circuit opinion in *Freitag*, previously concluded, "We can find no Tennessee case adopting a holding that counsel for the defense or prosecution may not ask a witness whether another witness is truthful." *Walker v. State*, No. M2010-00449-CCA-R3-PC, 2011 WL 795866, at *22 (Tenn. Crim. App. Mar. 8, 2011). And we noted in *Walker*, the *Freitag* court considered any error in the prosecutor's comments to be harmless. *Walker*, 2011 WL 795866, at *22 (citing *Freitag*, 230 F.3d at 1024). We reached a similar conclusion in *State v. Ailey*, No. E2017-02359-CCA-R3-CD, 2019 WL 3917557, at *40 (Tenn. Crim. App. Aug. 19, 2019) (declining the defendant's "invitation" to reach a "different conclusion from the *Walker* court" on the issue).

Because Defendant cannot establish the State's questions violated a clear and unequivocal rule of law, he is not entitled to plain error relief on this issue.

D. Right to Remain Silent

During Defendant's cross-examination, the following exchange occurred:

- 19 -

[Prosecutor]: Okay. In regards to—your story of what occurred and why you were upset, would you agree that this is the first time you've ever stated that this is kind of your justification for acting the way you did?

[Defendant]: This is the first time, sir, I ever got to speak on my behalf—

[Prosecutor]: Okay.

[Defendant]: —or defend myself—

Defendant contends this question, in which the State attacked Defendant's claim that he became enraged after seeing the victim performing oral sex on Mr. Bryant, constituted an impermissible comment on Defendant's pre-trial silence. Defendant did not object to this question at trial, but Defendant asserts he is entitled to plain error relief on appeal. We disagree.

In *Doyle v. Ohio*, 426 U.S. 610, 612-13 (1976), a defendant on trial for selling marijuana testified that he had been framed; on cross-examination, the defendant was asked why he had not raised this claim with law enforcement after his arrest. On appeal, the United States Supreme Court concluded that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Id.* at 619. In later opinions, though, the Court clarified that the *Doyle* holding was inapplicable to cases in which the prosecution impeached a testifying defendant by referencing the defendant's pre-*Miranda* statements. *See Jenkins v. Anderson*, 447 U.S. 231 (1980) (due process not violated by impeachment using pre-arrest, pre-*Miranda* warnings); *Fletcher v. Weir*, 455 U.S. 603 (1982) (due process not violated by impeachment using pre-*Miranda* statements that occur after defendant's arrest).

Here, the State's question did not explicitly reference Defendant's election to remain silent after being advised of his *Miranda* rights; thus, as the State asserts in its brief, any reference to Defendant's silence could have been to pre-*Miranda* silence, which is not precluded by *Doyle*. We also note that in this case, there is no proof that Defendant was ever provided with *Miranda* warnings, and this court cannot make that assumption from a silent record. In a similar case, this court concluded, "Because the record does not show that the defendant was ever provided his Miranda rights, thus erasing the pre- and post-Miranda distinction for purposes of this case, we conclude that the defendant has failed to establish that a clear and unequivocal rule of law was breached or that a substantial right of the defendant was adversely affected." *State v. Groves*, No. M2019-00536-CCA-R3-CD, 2020 WL 2391073, at *19 (Tenn. Crim. App. May 12, 2020). Accordingly, Defendant cannot establish that a clear and unequivocal rule of law was breached by the

- 20 -

State's cross-examination of Defendant when it questioned the timing of his explanation for attacking the victim.

Additionally, as the State observes in its brief, Counsel was not asked at the hearing on Defendant's motion for new trial whether Counsel considered objecting to the State's question. Defendant cannot establish that Counsel's failure to object was not for tactical reasons; therefore, we conclude Defendant has not established he is entitled to plain error relief on this issue.

## E. Ineffective Assistance of Counsel

In this direct appeal, Defendant raises a claim of ineffective assistance of counsel. He contends that Counsel was ineffective for not calling Ms. Reeves as a trial witness. Defendant argues the testimony of Ms. Reeves, who was present during part of the events, "became especially crucial after [Officer] Townsend testified he found a box cutter in [Defendant]'s car during an inventory search and after [Lt.] Cash testified that he saw [Officer] Townsend at the scene of the inventory search with a box cutter in hand." Defendant claims Counsel's failure to call Ms. Reeves prejudiced Defendant because her potential testimony would have supported Defendant's argument that he did not possess a box cutter during the offenses. The State counters that Counsel made a strategic decision not to call Ms. Reeves and was therefore not ineffective. We agree with the State.

Both the United States Constitution and the Constitution of the State of Tennessee guarantee criminal defendants the right to effective assistance of counsel. U.S. Const. amend VI; Tenn. Const. art. I, § 9. Under the Sixth Amendment to the United States Constitution, when a petitioner raises an ineffective assistance of counsel claim, the burden is on the petitioner to show both (1) counsel's performance was deficient and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). To prevail on such a claim, a petitioner must prove both prongs of the *Strickland* test, and failure to prove either is "a sufficient basis to deny relief on the claim." *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "[A] court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

An ineffective assistance of counsel claim presents a mixed question of law and fact. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). As a mixed question of law and fact, this court's review of a petitioner's ineffective assistance of counsel's claims is de novo

with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (citations omitted).

To prove that counsel's performance was deficient, a petitioner must establish that his attorney's conduct fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. As our supreme court held:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 934-35 (Tenn. 1975)). A reviewing "court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation." *Alley v. State*, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). A reviewing court also cannot criticize a sound, but unsuccessful, tactical decision made during the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

To prove prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." *Id.* As such, a petitioner must establish that his or her attorney's deficient performance was of such magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *Burns*, 6 S.W.3d at 463).

Here, Ms. Reeves' affidavit submitted at the motion for new trial hearing supports Defendant's contention that he did not force the victim into Defendant's car after they left Mr. Bryant's apartment. Additionally, Counsel and his investigator both testified that Ms. Reeves never mentioned Defendant having a box cutter during the time she saw him and the victim. However, both Counsel and his investigator had serious concerns over Ms. Reeves' credibility—they both testified that in her initial interview with the defense team, Ms. Reeves incriminated Defendant. She later provided trial counsel with a version of events more favorable to Defendant, but Counsel found Ms. Reeves' change in story, which came after she spoke with Defendant's brother, entirely inconsistent with her initial

statement. Counsel also found her initial statement more credible than the later one. Before trial, Counsel was reluctant to call Ms. Reeves based on his inability to know exactly how she would testify. After the State's testimony concerning the box cutter surprised the defense team, Counsel and his investigator discussed calling Ms. Reeves as a witness anyway, but Ms. Reeves had decided to be "as useless as possible." Counsel made the sound decision not to call Ms. Reeves as a witness. In its order denying Defendant's motion for new trial, the trial court stated, "The decision not to call her to testify as a witness during the trial was based upon a reasonable strategic decision after a thorough investigation." We agree.

Defendant also fails to prove any prejudice. The jury's verdicts on the lesser-included offenses resolve the question of the box cutter. We conclude Defendant cannot show the jury would have decided differently had Ms. Reeves testified.

In sum, Counsel's investigation revealed Ms. Reeves to be an unwilling witness with significant credibility concerns and capable of providing testimony damaging to Defendant's case. We therefore conclude that Counsel's reasoned decision not to call her as a witness was a strategic decision that did not constitute deficient performance, and that decision did not prejudice Defendant at trial. Accordingly, Counsel did not provide ineffective assistance in refusing to call Ms. Reeves as a witness.

## F. Cumulative Error

Finally, Defendant "respectfully suggests that the cumulative effect of the errors in his trial, if not so prejudicial on an individual basis as to amount to a deprivation of due process, nevertheless collectively resulted in the trial below being fundamentally unfair to him and a violation of due process." The cumulative error doctrine recognizes "that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010); *see also State v. Leath*, 461 S.W.3d 73, 116 (Tenn. Crim. App. 2013). Since we have discerned no singular error in Defendant's appeal, there can be no cumulative error. Accordingly, Defendant is not entitled to relief on this issue.

### III. Conclusion

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
MATTHEW J. WILSON, JUDGE